UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

WEST LOUISVILLE PRESERVATION                                    Plaintiff
HALL, LLC

v.                                               Civil Action 4:24-cv-80-RGJ-HBB

SECURA INSURANCE COMPANY                                        Defendant

* * * * *

### MEMORANDUM OPINION AND ORDER

Defendant Secura Insurance Company ("Secura") moves to strike and/or limit the testimony of Plaintiff West Louisville Preservation Hall's ("WLPH") expert Jeremy Britton ("Britton"), [DE 34], and to strike and/or exclude WLPH's experts Steve Prosser ("Prosser") and Scott Heidelberg ("Heidelberg") [DE 35]. WLPH responded, [DE 45], and Secura replied [DE 48]. Also before the Court is Secura's motion for summary judgment. [DE 36]. WLPH responded, [DE 44], and Secura replied [DE 47]. Briefing is complete and the matters are ripe. For the reasons below, the Court **GRANTS IN PART** Secura's motion to strike and/or limit the testimony of Plaintiff expert Jeremy Britton [DE 34]; **DENIES** Secura's motion to strike and/or exclude Prosser and Heidelberg [DE 35]; and **DENIES** Secura's motion for summary judgment. [DE 36].

### I.      BACKGROUND

A.  Insured Property and Policy

WLPH is a Kentucky Limited Liability Company located in Owensboro, Kentucky, founded by Jennifer Higdon ("Higdon") and Deborah Coomes ("Coomes"). [DE 1-2 at 8]. In 2012, WLPH purchased a commercial building located at 9661 State Route 56, Owensboro, Kentucky 42301 (the "building" or "insured property"), which is the subject of this litigation. [DE 36-7, Higdon Dep., at 578]. Relevant here, the roofing system of the building contains multiple roof

1

types: (1) a low-sloped ethylene propylene diene terpolymer ("EPDM") roofing system, which includes a ballasted EPDM portion ("low-sloped section"); (2) a large barrel-vaulted EPDM section ("barrel-vaulted section"); and (3) a low-sloped metal panel awning ("metal panel section"). [DE 44 at 1101; DE 36-2 at 486, 488]. The roof also contains HVAC units, as well as gutters, downspouts, and metal flashing. [DE 44 at 1099].

The building was insured by Secura under a commercial protection policy, Policy No. 20-CP-003215597-11 (the "Policy"), for a term of November 22, 2021 through November 22, 2022. [DE 47-1 at 1569; DE 1-2 at 20]. The Policy provided coverage for "direct physical loss of or damage to Covered Property[.]" [DE 1-2 at 70]. "Covered property" includes buildings on the insured property, including additions, fixtured, permanently installed machinery and equipment, and more. [*Id.*]. "Direct physical loss" is not specifically defined in the Policy. [*see generally* DE 1-2; DE 44-2, Devin O'Brien Dep., at 1303].

The Policy contains a "causes of loss" form that excludes from coverage various causes of loss, several of which are relevant here. First, paragraph B(2)(d)(1) excludes "loss or damage caused by or resulting from . . . [w]ear and tear[.]" [DE 1-2 at 90–91]. Second, paragraph B(2)(d)(2) excludes "loss or damage caused by or resulting from . . . [r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself[.]" [*Id.*]. Third, paragraph B(2)(f) states that Secura "will not pay for loss or damage caused by or resulting from . . . [c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." [*Id.* at 91]. Fourth, paragraph B(3)(b) provides that Secura "will not pay for loss or damage caused by or resulting from . . . [a]cts or decisions, including the failure to act or decide, of any person, group, organization or governmental body." [*Id.* at 92]. Fifth, paragraph B(3)(c) excludes

2

"loss or damage caused by or resulting from . . . faulty, inadequate or defective . . . [d]esign, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; . . . [m]aterials used in repair, construction, renovation or remodeling; or [m]aintenance[.]" [*Id.*]. Finally, paragraph C(1)(c) states that Secura

> will not pay for any loss that is a consequence of loss or damage . . . [to] [t]he interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless . . . [t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or . . . [t]he loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

[*Id.* at 94].

> The Policy also contains an appraisal provision, which states:

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

> a. Pay its chosen appraiser; and

> b. Bear the other expenses of the appraisal and umpire equally. If there is an appraisal, we will still retain our right to deny the claim.

[*Id.* at 78].

   B.  Storm Damage and WLPH's Claim

From July 31 to August 1, 2022, a storm with winds up to 70 miles per hour and hail 1 inch in size struck the insured property, resulting in damage to the roof. [DE 44-5 at 1328]. WLPH subsequently filed a claim with Secura, causing Secura to initiate an investigation. [DE 36-1 at 457; DE 44 at 1099]. Secura's adjuster, Penny Shewmaker ("Shewmaker") assigned the claim to independent adjuster T. Barrett & Associates to conduct an inspection. [DE 36-10, Shewmaker

3

Dep., at 594]. WLPH disagreed with the findings, so Secura retained Rimkus, an engineering firm, to conduct a reinspection. [*Id.* at 595].

Rimkus engineer Amanda L. Moore-Roberson ("Moore-Roberson") conducted an on-site reinspection of the building's roof on September 15, 2022. [DE 36-11 at 599–601; DE 36-1 at 485; DE 36-2 at 497]. In the report of her findings ("Rimkus report"), Moore-Roberson concluded that only the barrel-vaulted section of the roof sustained damage from the July 31-August 1, 2022 storm. [*Id.* at 486]. She concluded that the low-sloped section and the metal panel section were not damaged by the storm. [*Id.*]. She also concluded that the rooftop mechanical units (i.e., the HVAC units) had indentations that "were caused by hailstone impacts" but did not specifically conclude that the units had been damaged in the July 31-August 1 storm. [*Id.*].

Based on the conclusions in the Rimkus report, Secura issued its coverage determination to WLPH on November 30, 2022, accepting in part and denying in part WLPH's claim:

> Per the re-inspection completed by Rimkus Engineering, there were no signs of wind and or hail damage to the EPDM roof. The billowed and tented EPDM along the north, south and east sides are the direct result of natural shrinkage caused by the normal aging and exposure of the material to ultra violet light. The low slope barrel-vaulted membrane roof was damaged by wind on the date of loss.

> Additionally, indentations in rooftop mechanical unit fins were confirmed, however, our records indicate SECURA paid to remove and replace condensing fins from the May 10, 2016 loss, Claim #C0058002 and no documentation has been received supporting the repairs were ever made.

> Rimkus has confirmed maintenance related issues, as well as wear and tear, deterioration and faulty, inadequate or defective repair and maintenance. As these items are specifically excluded under the policy; we must partially deny your claim.

[DE 36-3]. Secura therefore relied on the various exclusions in the Policy to deny WLPH's claim in part. In accordance with this determination, Secura subsequently sent a letter to WLPH indicating that it would pay $41,456.95 for damage resulting from the windstorm. [DE 36-4].

4

WLPH disagreed with the amount paid by Secura and therefore invoked the Policy's appraisal provision. [DE 1-2 at 10].

On July 18, 2025, the parties received an appraisal award in relation to the barrel-vaulted section of the building's roof, thus concluding the appraisal process. [DE 28, Joint Status Rep., at 273]. Pursuant to the appraisal award, Secura issued payment in the amount of $227,199.97 to WLPH on August 22, 2025. [DE 36-13]. Neither party disputes that the appraisal award appropriately compensated WLPH for the damage to the barrel-vaulted section of the roof. However, WLPH maintains that "the Award did not include the entire Loss—*only* the barrel-vaulted roof." [DE 44 at 1102]. WLPH maintains that it is owed compensation for damage to: (1) the low-sloped EPDM roofing system; (2) the metal panel system; (3) the gutters, downspouts, and metal flashing; (4) the HVAC units; and (5) the interiors of the building. [DE 44 at 1099].

On July 29, 2024, while the appraisal process was ongoing, WLPH filed this action for breach of contract (Count I) and bad faith brought pursuant to KRS § 304.12-235 (Count II).[1] [DE 1]. In pursuing this action, WLPH retained several experts. Relevant here, WLPH disclosed as an expert Jeremy Britton ("Britton"), the owner of Exceptional Roofing, who was hired by WLPH to "provide temporary repairs and mitigation work related to the Loss." [DE 45-1, Pl.'s Expert Disclosures, at 1525]. WLPH anticipates that Britton will testify "as to the damage observed on the roof and interior of the Insured Premises" and "regarding the specific temporary repairs/mitigation efforts that have been undertaken by Exceptional [Roofing] and the cost related to the same." [*Id.*]. WLPH also disclosed Steve Prosser ("Prosser"), a "Registered Roof Consultant" who inspected the insured premises as part of the appraisal process and produced a

---

[1] Both parties agree that WLPH's bad faith claim is contingent on the breach of contract claim and therefore must be held in abeyance pending resolution of the breach of contract claim. [*See* DE 36-1 at 459; DE 44 at 1100 n.2]. Accordingly, Count II is not at issue in Secura's motion for summary judgment and will not be addressed in this opinion.

"Storm Damage Inspection Report" ("Initial Prosser Report" or "Initial Report") dated August 2, 2023. [*Id.* at 1522]. Upon being retained by WLPH as an expert witness, Prosser prepared a "Supplemental Storm Damage Inspection Report" ("Supplemental Prosser Report" or "Supplemental Report") dated April 22, 2025. [*Id.*]. WLPH anticipates that Prosser will testify regarding the conclusions in both reports, including that the July 31-August 1, 2022 windstorm damaged the premises. [*Id.*]. Third, WLPH disclosed Scott Heidelberg ("Heidelberg"), a licensed independent adjuster who provided estimates of the cost to repair damage to the insured premises from the storm using the Prosser's reports. [*Id.* at 1523].

## II.     MOTIONS TO EXCLUDE EXPERTS

### A.  Standard

The admissibility of expert testimony is set forth in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." 509 U.S. 579, 597 (1993); *see also Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements. First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the

6

testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Third, the testimony must be reliable.

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise. *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *5 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").

> Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact.

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with expert qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'" *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013), *adhered to on denial of reconsideration*, No. 5:09-CV-00121-TBR, 2013 WL 1878934 (W.D. Ky. May 3, 2013) (quoting *Daubert*, 509 U.S. at 597). To assess reliability, the court must consider "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). To assist with this

7

determination, the Supreme Court in *Daubert* laid out several factors for the courts to consider. *Daubert*, 509 U.S. at 592–94. These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1990) (citing *Daubert*, 509 U.S. at 593).

Courts have "stressed, [] that Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (citations omitted). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.*

B.  Motion to Strike and/or Limit the Testimony of Jeremy Britton [DE 34]

1.  *Britton's Qualifications and Testimony*

Britton is the owner of Exceptional Roofing LLC ("Exceptional"), a commercial roofing contractor that performed repairs on the insured property after the July 31-August 1, 2022 storm. [DE 34-1 at 315]. As WLPH's contractor, Britton inspected the property and took core samples

8

and photographs of the roof. [DE 46-1, Britton Dep., at 1553]. Britton performed roof repairs, including "lap seam re-adherence, patching, and [] puncture remediation." [*Id.* at 1549]. Britton also prepared an estimate, dated April 25, 2025, of costs to perform a roof replacement of the low-sloped section. [DE 44-10].

WLPH disclosed Britton as an expert witness to "testify on behalf of Exceptional as to the damage observed on the roof and interior of the Insured Premises from the Loss." [DE 34-1 at 315]. WLPH also anticipates that Britton "will testify regarding the specific temporary repairs/mitigation efforts that have been undertaken by Exceptional and the cost related to same." [*Id.*]. Finally, Britton "will testify regarding the amount set forth in his estimate and that said estimate reflects the fair, reasonable, and competitive replacement cost value and actual cash value of the necessary repairs to the Insured Premises as set forth therein." [*Id.*]. In his deposition, Britton confirmed that he has "not been specifically retained to provide any kind of export reports or provide any kind of expert opinions in this case." [DE 34-2, Britton Dep., at 321]. He confirmed that his testimony would be within his scope as a roofing contractor; that is, "look at the roof and provide an estimate for repairs." [*Id.* 321–22]. He also agreed that he would not provide any opinions with respect to the cause of damage to the roof and that his testimony would be limited to the "actual cost of repairs[.]" [*Id.* at 322].

### 2. *Analysis*

Secura moves to strike WLPH's expert Britton or limit his testimony to that of a lay witness. [DE 34 at 304]. Secura concedes that Britton should be permitted to provide opinion testimony about the cost of repairs rationally based on his perception as WLPH's roofing contractor but argues that he should not be permitted to provide testimony "based on scientific, technical, or other specialized knowledge (i.e. the cause and origin of the damage to the roof)."

9

[DE 34 at 308]. In response, WLPH clarifies that Britton will not testify as to the cause and origin of the damage. [DE 46 at 1535]. Rather, his testimony will be limited to: "(1) his observations of the damage; (2) the mitigation efforts taken by his company (and the costs associated therewith); and (3) the cost of replacing the low-slope EPDM roof at issue." [*Id.*]. Thus, the parties are aligned in their understanding of what testimony Britton may offer. They differ only with respect to whether that testimony should be "classified as that of a layperson." [*Id.* at 1536].

While expert witnesses generally can testify in the form of an opinion, lay witness opinion testimony is limited to that which is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The Sixth Circuit has recognized that the distinction between lay witness and expert witness testimony is "far from clear in cases where . . . a witness with specialized or technical knowledge was also personally involved in the factual underpinnings of the case." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007). "[T]he fact that [a] witness, by virtue of his or her experience in a business, has knowledge not possessed by the average person does not render the witness's opinion an expert opinion." *United States v. Whaley*, 860 F. Supp. 2d 584, 594–95 (E.D. Tenn. 2012). In other words, a layperson may offer opinion testimony that results from "the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 advisory committee's note (2000). The analysis for determining whether testimony is lay testimony or expert testimony must focus "not on the witness, but on the testimony the witness intends to provide." *Braun Builders, Inc. v. Kancherlapalli*, No. 09-11534-BC, 2010 WL 1981008, at *3 (E.D. Mich. May 18, 2010) (citing *White*, 492 F.3d at 403).

10

The parties agree that Britton may offer testimony only as to his personal knowledge of the state of the roof, the cost of repairs, and mitigation efforts taken by his company. They likewise agree that Britton may not offer testimony as to the cause or origin of the damage. Practically speaking, no dispute exists as to Britton's testimony. Yet WLPH seeks to have his testimony labeled as "expert" testimony. The substance of Britton's proffered testimony, however, is more properly labeled as lay witness testimony. Britton is offered to provide testimony as to his own perception of the damage to the roof, the repairs his company made, and the cost estimate of further repairs. While Britton may have particularized knowledge of the cost of such damage given his experience as a roofing contractor, this does not render his opinion an expert opinion. *See Trs. Main/270 LLC v. ApplianceSmart, Inc.*, No. 2:22-CV-1938, 2025 WL 1285746, at *3 (S.D. Ohio May 4, 2025); *Eng. Woods Civic Ass'n/Resident Cmty. Council v. Cincinnati Metro. Hous. Auth.*, No. 1:03-CV-186, 2004 WL 6043508, at *1 (S.D. Ohio Nov. 23, 2004) (explaining that lay witness could testify as to structural condition of housing development given their first-hand observations of the condition, despite not being qualified as experts). In effect, Britton's classification as a lay witness is negligible given that the parties are aligned in terms of the permissible scope of Britton's testimony.

Accordingly, the Court **GRANTS** Secura's motion [DE 34] to the extent it seeks to limit Britton's testimony to that of a lay witness. Britton may testify as to his personal observations as WLPH's roofing contractor, including his observation of damages, the cost of repairs, and which repairs were made. Britton may not provide opine as to the cause or origin of the damage.

11

C. <u>Motion to Strike and/or exclude Steve Prosser [DE 35]</u>

*1. Prosser's Qualifications and Testimony*

Prosser is a licensed engineer and registered roof consultant through a nationwide certification process from the International Institute of Building Enclosure Consultants ("IIBEC"). [DE 44-1, Prosser Decl., ¶ 1]. In 2000, Prosser founded Prosser & Associates Engineering, which conducts forensic investigations of residential and commercial structures that have been damaged as a result of weather events. [*Id.* ¶ 8]. These investigations involve "the review of weather reports and the comparison of those reports to the conditions in the field." [*Id.*]. In his more than 25 years leading Prosser & Associates, Prosser has conducted thousands of forensic investigations. [*Id.* ¶ 9].

Prosser was hired by WLPH's appraiser, Travis Robertson ("Robertson"), to inspect and evaluate whether the July 31-August 1, 2022 storm caused damage to the building. [DE 34-1 at 311]. Prosser inspected the premises on July 21, 2023 to determine the cause of the damage, the scope of the damage, and "the necessary repair methodology with regard to any damage." [*Id.* at 312]. Prosser summarized the results of his investigation in the Initial Prosser Report dated August 2, 2023. [*Id.*]. WLPH later retained Prosser as an expert to offer his opinion as to whether the roof was damaged by wind and hail, and if so, when the damage occurred. [DE 44-1, Prosser Decl., ¶ 19]. Once retained as an expert witness by WLPH, he prepared the Supplemental Prosser Report dated April 22, 2025. [*Id.*]. Prosser is expected to testify as to his conclusions in both the Initial Report and the Supplemental Report, including his opinion that the July-August 2022 storm damaged the insured premises, his conclusions as to the "scope and extent of the damage," and his opinions as to the necessary repairs. [DE 34-1 at 312–13].

Prosser testified that in preparing the Initial Report, he was informed by Robertson that "the roof was in good condition" before the storm and "had some repairs." [DE 35-7, Prosser Dep., at 433]. When asked what specific information had been provided to him "with respect to any work that had been done on the roof in advance of July 31, 2022," Prosser responded "zero." [*Id.* at 434]. However, he also noted that, upon observing the roof, "[he] can tell what's been done and not [done] to [the roof] almost as well as [he] can be told." [*Id.*]. Thus, upon inspecting the roof, Prosser could see "small areas where some coating had been put on" and one or two patches . . . not a whole lot." [*Id.*]. In other words, Prosser confirmed that he was not specifically provided with information from WLPH regarding past repairs, but he could observe the repairs from his own inspection. [*Id.* at 434–35].

The Supplemental Report indicates that Prosser reviewed meteorological reports, including the "Core Logic Wind Verification Report," showing "71 mph winds at the subject property on August 1, 2022," as well as a "site-specific meteorological report by Steve Harned which concurs with the NOAA data found above: hail of 1" diameter and winds of 70 mph were experienced at the subject property on August 1, 2022." [DE 44-1 at 1221].

In inspecting the premises and preparing both reports, Prosser followed the HAAG Engineering ("HAAG") standards on identifying wind and hail damage. [DE 44-1 at 1152, 1225]. HAAG identifies four "damage modes" that signify wind and hail damage to the roof membrane: peeled or opened membrane; ballooning or wrinkling of the membrane; punctured or torn membrane; and bruised or scraped membrane. [*Id.* at 1225; DE 35-7, Prosser Dep., at 437].

With respect to evidence of a "peeled or opened membrane," Prosser testified that his inspection revealed "18 locations . . . of wind damage around the perimeter, and then 75 percent of all seams on the low slopped [sic] roofing system appeared to be open due to environmental

13

forced from the wind." [DE 35-7, Prosser Dep., at 437]. When asked how many of those seams were open prior to the 2022 weather event, Prosser responded that there were "two to three areas where some coating was put on the seams," indicating that the seams had previously been open. [*Id.* at 438]. Prosser confirmed that he had not been provided information as to who performed those previous repairs or when they were performed. [*Id.*]. When asked whether these openings could happen for reasons other than wind damage, Prosser stated,

> [t]hey can, yes. But the wind damage would be the primary focus, and because we did see so many other areas of wrinkling, lifting of the membrane, deep bonding of the membrane, then you can make the assumption that the open seams that we had seen were related to that.

[*Id.* at 439]. When asked whether the damage could have occurred at some time other than the July-August 2022 storm, Prosser responded,

> I would not say it's very possible. It's indicative of something that would have happened on that time right there from what – from what we saw. I would not say very possible, but I could not rule out some other – some other things if storms had happened right around that date.

[*Id.* at 441]. When asked to explain how he could determine that this particular damage was "indicative of something occurring on July 31/August 1, 2022," and not another date, Prosser provided the following explanation:

> When you're looking at something a year later like this, on wind what you're looking for on the peeled or the open seams or the peeling around the membrane, you're looking for the condition of the adhesive that was there and any debris that might have gotten blown into it during [] the storm.
>
> If the adhesive has, you know, has alligatored and broken up specifically, you can be fairly sure that that's happened year – in years back. If everything's still clean, you know that something has happened in the last year to two at that point right there. Especially around the perimeter where it's glued down to the drip edge or to the gravel stop, you can look at the condition of that.
>
> When these membranes get pulled up and are no longer adhered, then they start getting moisture from the sides and from the top and the bottom, and if it's very, very old, the membrane will start fraying around the outside edge and see that.

14

> So we could rule out whether it had happened years previous, but you know, we're asked all the time, can you say specifically within a month or something, and no, ma'am, you cannot do that.

[*Id.* at 441–42]. Prosser reiterated that the damage "was indicative of something that would have happened on or around the storm date" but stated that he could not deny that the damage could have happened before or after the July-August 2022 storm. [*Id.* at 444].

With respect to the damage to the HVAC units, Prosser similarly testified that there were "some areas on the fins that had [] hail damage before [the July-August 2022 storm]," but "when fins are damaged years prior, they will not be shiny anymore." [*Id.* at 446]. Accordingly, Prosser could distinguish between old damage and new damage. He testified that some areas of the damage to the fins were shiny, which "would indicate that it had happened in the last . . . year, 18 months, something of that nature right there." [*Id.*].

When further questioned about his ability to determine whether the roof damage occurred during the July-August 2022 storm and not at some other point, Prosser again stated "it's indicative of the date of loss that we were given." [*Id.* at 448]. In explaining how the damage was indicative of that date, Prosser explained,

> when we looked at each one of the seams and any adhesive that was given or any weldments that were given, the condition of the edge of the seam that had been opened, all of those type of indicators right there would be indicative of something that happened a year to 18 months, six months to 18 months, sometime in that time frame. . . . It was not indicative of something that would have happened extremely long time ago. We can, you know, rule out that these things didn't happen 10 years ago or something.

[*Id.* at 448]. Prosser confirmed that he was "not asked to consider any other storms that had occurred prior to or after that time which may have caused the damage [he] was seeing[.]" [*Id.* at 449]. He testified that he ruled out any damage that was visibly eight to ten years old, and that everything he documented "was indicative of something that could have happened on that date

right there." [*Id.*]. Prosser confirmed that he did not consider other storms elsewhere in his deposition:

> Q. Okay. Did you do any evaluation into storms that occurred in the year prior to this claimed event at all?
>
> A. No, ma'am. Again, we were just hired for appraisal support on this and that was not something that we were requested to do.

[*Id.* at 440].

## 2. *Analysis*

Secura argues that Prosser must be excluded as an expert witness because his opinions are speculative and unreliable. [DE 34 at 339]. Secura maintains that Prosser's conclusion that the July-August 2022 storm caused the damage to the building is speculative because he came to this conclusion upon performing one inspection of the premises nearly a year after the storm occurred while failing to consider other possible causes. [*Id.* at 340]. Secura highlights Prosser's admissions that he obtained no information from WLPH regarding preexisting roof damage and that he could not rule out that the roof damage occurred at some time other than the July-August 2022 storm. [*Id.* at 334–35, 340]. Secura also emphasizes Prosser's admission that his opinion is "subjective" and maintains that the crux of his opinion is that the July-August 2022 storm "*may* have been the cause of the observed damage, along with any number of other potential causes within 8-10 years of Mr. Prosser's inspection." [*Id.* at 340]. Secura maintains that "Prosser is not permitted to subjectively speculate to the jury that the observed damage *could* have been caused by the July 31, 2022-August 1, 2022 storm event" while failing to account for other possible causes. [*Id.*]. Finally, Secura maintains that Prosser admitted that he did not consider other storm events that could have caused the damage, so his opinion as to the date of the damage is unreliable. [*Id.* at 335, 339]. In

16

short, Secura challenges only the reliability of Prosser's testimony, not the relevance of his testimony or Prosser's qualifications.

In response, WLPH argues that Prosser did consider other possible causes of the damage, including "other storm events; major traumas to the structure; construction blasting and similar activities; and military testing." [DE 45 at 1510]. WLPH maintains that Prosser also reviewed meteorological data, including the CoreLogic Wind Verification Report from 2009 to 2022, the National Weather Service ("NWS") storm events database, and the Steve Harned meteorological report. [*Id.*]. WLPH maintains that Prosser's opinion as to the cause of the damage is not speculation or "improper extrapolation" given that Prosser explicitly testified as to how specific aspects of the roof damage signaled the recency of the damage. [*Id.* at 1512–13]. WLPH relies in part on Prosser's declaration, which was submitted after Secura's motion for summary judgment and motion to exclude.[2] [DE 44-1]. In his declaration, Prosser states that he had an interview with the managers/owners of WLPH, during which they informed him of prior repairs to the roof and the July-August 2022 storm. [*Id.* ¶ 22].

First, Prosser's admission that he "could not rule out" other causes of the roof damage does not make his testimony inadmissible. "An opinion on causation need not eliminate all other possible causes of the injury and the fact that other causes are not eliminated or a precise cause is not stated go to the accuracy of the conclusion, not the soundness of the methodology." *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x 914, 920 (6th Cir. 2004); *see also Jahn v. Equine Servs.*, *PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("In order to be admissible on the issue of causation,

---

[2] In Secura's reply in support of its motion for summary judgment, it argues that the sham affidavit doctrine bars the Court from considering portions of Prosser's declaration. [DE 47 at 1559]. The Court addresses this argument below in its discussion of Secura's motion for summary judgment. For purposes of determining the admissibility of Prosser's testimony, the Court need not consider Prosser's declaration. As explained herein, the Court finds that Prosser's testimony is admissible based solely on his reports and his deposition.

an expert's testimony need not eliminate all other possible causes of the injury."). Importantly, "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they know answers to all the questions a case presents . . . ." *Jahn*, 233 F.3d at 390 (citation omitted).

Here, Prosser explained his scientific method, his observations about the state of the roof, and how he concluded from those facts that the July-August 2022 storm likely caused the damage. For example, when asked how he could determine that the damage occurred on the date in question and not some other date, Prosser explained that he looked at the condition of the adhesive on the "peeled or open seams" or the "peeling around the membrane[.]" [DE 35-7, Prosser Dep., at 441]. He explained that if the adhesive has "alligatored and broken up," the damage occurred "years back," whereas "[i]f everything's still clean, . . . something has happened in the last year to two[.]" [*Id.* at 442]. He further noted that membranes with older damage will "start fraying around the outside edge." [*Id.*]. The roof's lack of these characteristics led Prosser to conclude that the damage was recent—within "a year to 18 months." [*Id.* at 448]. Prosser also noted that only two or three of the roof's eighteen instances of "peeled or opened membrane" appeared to have occurred prior to the 2022 storm. [*Id.* at 437–38]. Prosser testified that he made this conclusion based on his observation of coating on the seams, which indicated that the seams had previously been opened and repaired. [*Id.* at 438]. Similarly, Prosser could distinguish which damage to the HVAC units existed before the July-August 2022 storm based on the shininess of the fins. [*Id.* at 446]. Finally, Prosser testified that he was informed before performing his inspection that the roof was "in good condition" prior to the July-August 2022 storm. [*Id.* at 433]. Secura does not dispute that this methodology is sound; it simply disputes the validity of the conclusion that Prosser arrived at based

on that methodology. The fact that Prosser failed to eliminate other weather events as possible causes goes to the accuracy of his conclusion and the weight of his testimony, not to the soundness of his methodology or the admissibility of his opinion. *Jahn*, 233 F.3d at 390. Secura will have the opportunity to discredit this conclusion on cross-examination.

Secura's challenge that Prosser's opinion is "speculative" or the product of "extrapolation" likewise fails. Prosser's reports and deposition testimony clearly set forth the facts and methodology upon which he based his conclusions. The Supplemental Report indicates that Prosser reviewed meteorological data indicating that a severe wind and hailstorm occurred on July 31-August 1, 2022. [DE 44-1 at 1221]. The report then details the various signs of weather damage based on HAAG standards. [*Id.* at 1226–27]. In deposition testimony, Prosser testified as to how the specific characteristics of the damage indicated that the damage was likely the result of the July-August 2022 storm. Prosser's conclusion is based on applying scientific methodology to facts in the record and therefore should not be dismissed as a mere "assumption" or "guess." *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530. While Prosser's opinion may be "shaky," this bears on the weight of his testimony, not its admissibility. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)) (citations omitted)); *L.E. Cooke Co.*, 991 F.2d at 342 ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.").

Finally, *Helping Hands Home Improvement, LLC v. Owners Ins. Co.* is unhelpful to Secura's position. No. 1:20-CV-01258, 2022 WL 1797037 (W.D. Tenn. Jan. 20, 2022). Secura maintains that, in *Helping Hands*, "the Western District of Tennessee excluded Mr. Prosser from offering functionally identical opinions to those proffered in the instant case." [DE 35 at 340]. However, in *Helping Hands*, plaintiffs failed to respond to defendant's motion to exclude Prosser's opinion, so the court granted defendant's motion without considering the substantive grounds on which the motion was based. 2022 WL 1797037, at *3. Secura attempts to sidestep this issue by highlighting that "the Court *did* grant Owners Insurance Company's motion, in part, 'for good cause shown.'" [DE 35 at 341]. However, the "good cause" the court referred to was simply the plaintiffs' failure to respond. *Helping Hands*, 2022 WL 1797037, at *3 (explaining that "[f]ailure to respond timely to any motion . . . may be deemed good grounds for granting the motion" and granting defendant's motion to exclude Prosser "[i]n the absence of a response from Plaintiffs and for good cause shown").

Secura also cites to *Salgado v. Lexington Ins. Co.*, an out-of-circuit district court opinion that this Court need not credit. No. 1:22-CV-23460-KMW, 2023 WL 9681244, at *2 (S.D. Fla. Sept. 22, 2023). Even so, the Court notes that *Salgado* is distinguishable. In *Salgado*, plaintiffs sought reimbursement from defendant insurance provider for covered losses resulting from Hurricane Irma. *Id.* at *1. Defendant sought to exclude plaintiffs' causation expert on the basis that he failed to consider alternative causes of damage. *Id.* at *3. During his deposition, the expert failed to provide meaningful responses to defense counsel's questions as to why he ruled out other possible causes. The expert simply stated that he did not deem other "storm events obvious or reasonable as an alternate cause of damage," that preexisting damage and prior repairs to the roof were "unworthy of consideration," and that the age water stains on the ceiling was "not relevant."

*Id.* By contrast, Prosser explained how he arrived at his opinion that the damage to the insured property occurred during the July-August 2022 storm. He noted that the damage he observed was indicative of wind damage, and not some other cause, because he observed "so many other areas of wrinkling, lifting of the membrane, deep bonding of the membrane," which allowed him to "make the assumption that the open seams that we had seen were related to [wind damage]." [DE 35-7, Prosser Dep., at 439]. He also noted that it was unlikely that the damage was caused by prior storm given that the particular characteristics of the damage suggested that the damage occurred within one year to eighteen months. [*Id.* at 446, 448]. Unlike the expert in *Salgado*, Prosser did not dismiss alternative causes as irrelevant or unworthy of consideration. Instead, he gave reasoned explanations as to why, in his opinion, those alternatives were not viable causes.

Accordingly, the Court finds that Prosser's opinion is based on sufficient facts or data and that his testimony is the product of reliable methods. The Court therefore **DENIES** Secura's motion to strike and/or exclude Prosser [DE 35].

### D.  Motion to Strike and/or exclude Scott Heidelberg [DE 35]

#### 1.  *Heidelberg's Qualifications and Testimony*

Heidelberg is an independent adjuster retained by WLPH to provide estimates, using "Xactimate," of the cost to repair the damage to the insured premises. [DE 34-1 at 313]. Using the repair recommendations and methodology set forth in Prosser's reports, and upon inspection of the insured premises, Heidelberg prepared estimates. [*Id.* at 314]. He is expected to testify "as to the fair, reasonable, and competitive replacement cost value and actual cash value of the necessary repairs to the Insured Premises based on the repair methodology and scope provided by Mr. Prosser." [*Id.*].

21

### 2. *Analysis*

Secura argues that Heidelberg 's opinions are derivative of Prosser's and therefore must he be excluded to the same extent as Prosser. [DE 35 at 344]. That is, Heidelberg's opinions as to the cost to repair the damage are based on the assumption that Prosser's opinions are "true and accurate," so if Prosser's opinion is excluded so too must Heidelberg's. [*Id.* at 345].

Accordingly, Secura's sole argument that Heidelberg must be excluded is contingent on Prosser's exclusion. Because the Court finds Prosser's testimony admissible, this argument fails. The Court therefore denies Secura's motion with respect to Heidelberg.

As a result, Secura's motion to strike and/or exclude Scott Heidelberg [DE 35] is **DENIED**.

### III.   MOTION FOR SUMMARY JUDGMENT

#### A.  Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*,

22

342 F.3d at 497 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted). The nonmovant must do so by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1); *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

B. Discussion

Secura argues that it is entitled to judgment as a matter of law on WLPH's breach of contract claim because WLPH has produced no non-speculative evidence that damage to portions of the building other than the barreled-vaulted section was caused by the July 31, 2022-August 1,

23

2022 weather event at issue rather than some non-covered cause, such as wear and tear or faulty maintenance. [DE 36-1 at 477]. Secura maintains that speculative evidence is insufficient to create an issue of fact worthy of submission to a jury, and WLPH relies on speculation by Prosser to establish that the July-August 2022 storm caused damage to other portions of the building. [*Id.* at 480]. Further, Secura contends that evidence in the record establishes that the building had "persistent roof leaks prior to the weather event at issue" and that WLPH had been advised to replace the roof before July 2022, indicating that the roof damage was caused by wear and tear and not a covered loss. [*Id.* at 478].

WLPH maintains that it has presented sufficient evidence that the July 31-August 1 2022 storm damaged the entire roofing system and interiors of the building to establish a dispute of fact as to whether Secura breached the insurance contract by failing to compensate WLPH for that damage. [DE 44 at 1117]. WLPH argues that it has presented non-speculative proof in support of its claim that other components of the building were damaged by the storm. [*Id.* at 1118]. Specifically, WLPH maintains that Prosser's opinions provide non-speculative evidence that the storm damaged the low-sloped section; the metal panel section; the HVAC units; and the gutters, downspouts and metal flashing. [*Id.* at 1104–05].

### 3. *Prosser Declaration*

In its reply, Secura takes issue with Prosser's declaration, which was submitted after Secura's motion for summary judgment and which, Secura argues, "contradicts his earlier deposition testimony in numerous respects." [DE 47 at 1559]. Secura maintains that this declaration was filed purely to create a factual issue as to the cause of the damage and thus constitutes a sham affidavit. [*Id.* at 1559–63]. For instance, Secura points out that Prosser previously testified that he was provided with "zero" information about prior work performed on

24

the roof but then stated in his declaration that he conducted an interview with WLPH owners about prior roof leaks and repairs. [*Id.* at 1559–60]. Similarly, Secura notes that Prosser previously testified that he performed no evaluation of storms that occurred in prior years, while his declaration asserts that he did consider other storm events. [*Id.* at 1560]. Secura maintains that the Court should not consider these contradicting statements in deciding its motion for summary judgment.

The Court need not decide the issue of whether Prosser's declaration contradicts his previous deposition testimony or whether portions of his declaration must be stricken. As detailed below, even without considering the purportedly contradictory statements in Prosser's declaration, the Court finds that there is a genuine dispute of material fact with respect to the cause of the damage to the insured premises.

### 4.  Breach of Contract Claim

To recover for breach of contract under Kentucky law, a plaintiff must show "1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citing *Barnett v. Mercy Health Partners–Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). The crux of Secura's argument is that it denied only those portions of WLPH's claim that were not covered under the Policy, and therefore no breach occurred. Secura maintains that only the barrel-vaulted section of the roof sustained damage in the July-August 2022 windstorm, while all other building components were damaged pursuant to excluded causes of loss, such as wear and tear and inadequate maintenance. [DE 36-1 at 480]. The parties do not dispute what constitutes an excluded cause of loss under the Policy; they only dispute whether the damage to the building fell within those exclusions. Accordingly, the sole question at this juncture is whether damage to the

25

components of the building other than the barrel-vaulted section was caused by the July-August 2022 storm. If there is a genuine dispute of fact with respect to whether the storm caused the damage, summary judgment on the breach of contract claim is improper.

Here, WLPH offers sufficient evidence that other portions of the building were damaged by wind and hail in the July-August 2022 storm to establish a genuine dispute of fact. Specifically, Prosser's expert report states that the storm caused damage to the following portions of the building: (1) the gutters, downspouts and metal flashing; (2) the HVAC units; (3) the metal panel section; (4) the low-sloped section of the roof; (5) the interiors of the building; and (6) the "ballasted EPDM membrane." [DE 44-1 at 1226–27]. In his deposition testimony, Prosser repeatedly stated that the damage he observed was "indicative of something" that occurred on the July 31-August 1, 2022 date. [DE 35-7, Prosser Dep., at 440–42, 444, 448]. As discussed, Prosser also explained *why* the particular characteristics of the damage signaled that the damage occurred during the storm. Contrary to Secura's assertion, Prosser's report and testimony constitutes evidence "that the claimed damage to [the] building was caused by a covered cause of loss under the Policy, as opposed to an excluded cause of loss[.]" [DE 46-1 at 480].

Nevertheless, Secura maintains that this evidence is mere speculation. [DE 36-1 at 478–79]. This argument mirrors that which Secura made in its motion to exclude Prosser as an expert—that is, that Prosser failed to consider previous damage and repairs to the building and subjectively concluded that "the observed damage may have occurred at some unspecified time less than 8 years prior to his inspection." [*Id.* at 479]. As already stated, this is an oversimplification of Prosser's testimony. Prosser explained how he arrived at his conclusion that the damage was caused by the storm and not by some other cause. For example, Prosser explained that he could tell that damage occurred recently based on the condition of the adhesive and the roof membranes.

26

[DE 35-7, Prosser Dep., at 441–42]. He also stated that he observed "spatter marks on the EPDM roofing that indicated that hail . . . had hit the roof." [*Id.* at 445]. He then explained that he "never saw any punctures or penetrations through the EPDM roofing," indicating that "the hail was most likely smaller in size, which the weather data did confirm." [*Id.*]. Thus, Prosser considered both weather data and the physical state of the roof and formed opinions based on those pieces of information. While "mere speculation will not suffice to defeat a motion for summary judgment," Prosser's reasoned explanations for his opinions constitute more than "mere speculation." *See Westlake Vinyls, Inc. v. Goodrich Corp.*, 523 F. Supp. 2d 577, 582 (W.D. Ky. 2007). WLPH has offered specific probative evidence supporting a finding in its favor, not simply "speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

Secura also highlights the fact that WLPH owners Higdon and Coomes "admitted that the building had persistent roof leaks prior to the weather event at issue" and that Higdon "conceded that WLPH's insurance agent, Assured Partners, informed WLPH that a roof replacement and/or major roof renovations were necessary. [DE 36-1 at 462, 478]. These statements mischaracterize Higdon's and Coomes's testimony. First, the portion of Higdon's testimony that Secura cites to makes no mention of "persistent roof leaks." Rather, she states that the roof on the front of the building had been previously "replaced or reseamed" and that "any time there was any kind of leak, . . . they would come out and patch it or reseam it." [DE 36-7, Higdon Dep., at 571–72]. Similarly, the portion of the Coomes deposition Secura cites says nothing of persistent roof leaks. Coomes simply states that WLPH solicited a bid for a new roof prior to July 2022. [DE 36-9, Coomes Dep., at 591–92]. As to the roof replacement, Higson testified that it was a "recommended" to replace the roof, but that they did not "see an immediate to do that" given that

27

they did not "have nearly as many leaks" at that time. [DE 36-7, Higdon Dep., at 583–84]. Secura improperly re-words Higdon's and Coomes's testimony to state something far more absolute and drastic than what was actually conveyed. Further, even if it is true that WLPH's roof had persistent issues prior to the July-August 2022 storm and WLPH required a roof replacement, these facts simply create a dispute of fact as to whether the roof damage was caused by the storm or by an excluded cause of loss. They do not conclusively establish that the damage was preexisting.

Ultimately, Secura's argument boils down to a request that the Court assign more weight to Secura's proffered evidence than WLPH's. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249). Secura and WLPH have both presented opposing evidence as to the cause of the damage; it is not for the Court to determine the truth of that evidence.

Accordingly, the Court **DENIES** Secura's motion for summary judgment. [DE 36].

### IV.    CONCLUSION

For the reasons above, the Court **ORDERS** as follows:

(1) Secura's motion to strike and/or limit the testimony of Plaintiff expert Jeremy Britton [DE 34] is **GRANTED IN PART**;

(2) Secura's motion to strike and/or exclude Prosser and Heidelberg [DE 35] is **DENIED**; and

(3) Secura's motion for summary judgment [DE 36] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

July 31, 2026

28